# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

DONALD JAY GOSS and                              )
LINDA SUE GOSS,                                  )
                                                 )
       Plaintiffs,                    )
                                                 )
v.                                               )      Case No. 13-CV-0374-CVE-TLW
                                                 )
BOARD OF COUNTY COMMISSIONERS                    )
OF CREEK COUNTY, STATE OF                        )
OKLAHOMA, and CREEK COUNTY                       )
SHERIFF JOHN DAVIS, in his official capacity,    )
                                                 )
       Defendants.                    )

## OPINION AND ORDER

Now before the Court are the motion of defendant Board of County Commissioners of Creek County, State of Oklahoma (the Board) for summary judgment, Dkt. # 74, the motion of defendant Creek County Sheriff John Davis for summary judgment, Dkt. # 76, and the combined motion of plaintiffs Donald Jay and Linda Sue Goss for partial summary judgment, Dkt. # 78. Plaintiffs allege claims under 42 U.S.C. § 1983 and Oklahoma state law based on a search of their home and their subsequent arrest and detention. The Board seeks summary judgment on the grounds that it is not the proper party to be sued under § 1983, and that it cannot be liable under Oklahoma law for plaintiffs' state law claims. With regard to the § 1983 claims, Sheriff Davis contends that plaintiffs can show neither a constitutional violation nor a practice, custom, or procedure of the Creek County Sheriff's Office (CCSO) causing a constitutional violation with respect to events of this case. He also states that he is not the proper party to be sued under Oklahoma state tort law, and for that reason he is not liable for plaintiffs' state law claims. Plaintiffs have moved for partial summary

judgment on the liability of both defendants as to ten of their eleven claims, encompassing all of their federal and most of their state law claims.[1]

## I.

On March 31, 2012, a Tulsa County Metro Drug Task Force investigator, Tulsa County Sheriff's Deputy Jesse Brewer, contacted Lieutenant Leslie Ruhman of the CCSO regarding a tip that Deputy Brewer had received. Dkt. # 78-3, at 12.[2] Lieutenant Ruhman asked CCSO Deputy Scott Forrester to speak with Deputy Brewer. Id. at 8. Deputy Forrester learned that Deputy Brewer had been working with an informant in Tulsa County, and that the informant had made a controlled purchase of narcotics. Dkt. # 84-3, at 27. The informant also told Deputy Brewer that he regularly purchased marijuana from a residence in Creek County, and that he had purchased marijuana there the previous day from a man named Larry Tatro. Id. at 27-28. Deputy Brewer drove the informant to Mannford, Creek County, Oklahoma, and the informant identified the residence at 283 Navajo Place as being the site of the purchases. Dkt. # 78-5, at 3-4. Deputy Brewer relayed this information to Deputy Forrester, including directions to the residence and a description of the residence and its environs, but he was unsure whether the correct address was 283 or 238 Navajo Place. Dkt. # 84-5, at 4-5. After sending Deputy Forrester an e-mail regarding what he had found, Deputy Brewer undertook no further investigation of the informant's tip. Dkt. # 78-5, at 3-4.

---

[1] Plaintiffs do not seek summary judgment on their state law claim of negligent and intentional infliction of emotional distress.

[2] As the parties have filed cross-motions for summary judgment on essentially the same claims, the vast majority of the evidence provided to the Court is duplicative. Thus, the Court will cite primarily to the evidence accompanying plaintiffs' motion for partial summary judgment, Dkt. # 78, as well as defendants' responses to plaintiffs' motion. Dkt. ## 84, 86.

Later that day, Deputy Forrester followed Deputy Brewer's directions to 283 Navajo Place, where he found a residence matching the description that Deputy Brewer had given him. Dkt. # 78-3, at 14. He then drafted an application and affidavit for search warrant and a proposed search warrant. Id. at 16. Although he did not speak with the informant, Deputy Forrester included the information provided by the informant in the application and the warrant. Id. at 16-17. The affidavit for search warrant stated the place to be searched as 238 Navajo Place, but the search warrant stated 283 Navajo Place as the address. Dkt. ## 84-4, at 1, 84-6. Both documents included an identical description of the residence, as well as directions to the residence from a nearby intersection. Id.[3] The search warrant referenced Larry Tatro on its face, and it authorized officers to search the residence for "marijuana, fruits, instrumentalities, monies, records indicating the sales of illegal drugs and proof of residency." Dkt. # 84-6. At 8 p.m. that evening, Deputy Forrester presented the affidavit and the search warrant to Creek County District Judge Joe Sam Vassar at the judge's home. Dkt. # 78-3, at 14. Judge Vassar questioned Deputy Forrester about the facts in the affidavit, particularly seeking more information about Tatro. Id. at 16. Deputy Forrester called Deputy Brewer, who was able to provide a physical description. Id. at 14. Judge Vassar signed the search warrant,

---

[3]     The description and directions in the warrant are as follows:

    The residence to be searched is located 283 Navajo Place, in the city of Mannford, Creek County and State of Oklahoma. The residence is a singlewide mobile home, comprised of light color siding. The front door of the residence face east, to access the first door you go through a covered screened in porch. Directions to the residence are from the intersection of Basin Road and Keystone loop go West to the 'Y' intersection one mile. Turn South on Keystone loop to Creek Lane, continue South to Navajo Place, turn West. The residence is located as the fourth residence on the South side of the road. The residence number is marked on a box on the front of the residence.

    Dkt. # 84-6 (all errors in original).

and thereafter Deputy Forrester gathered a number of officers to assist him in its execution. Dkt. # 84-3, at 29.

Plaintiffs resided at 283 Navajo Place. Dkt. # 78, at 8. On the evening of March 31, 2012, Mrs. Goss was at home watching a movie, while Mr. Goss had gone fishing on a nearby lake. Dkt. ## 78-6, at 2, 84-8, at 14. When Deputy Forrester and the other officers arrived to execute the search warrant, they entered the home through an open front doorway. Dkt. # 78-6, at 2. Deputy Forrester handed Mrs. Goss a copy of the search warrant and asked if she knew anyone named Larry Tatro. Dkt. # 78-3, at 25. She replied that she did not. Dkt. # 78-6, at 4. Deputy Forrester examined the mail at the residence and found that it was all addressed to plaintiffs. Dkt. # 78-3, at 26. A drug dog that had accompanied the officers completed a sniff of the home, but the dog did not alert to the presence of narcotics. Id. at 28-29. Officers then began to search the residence physically, and one officer discovered a one-gallon plastic bag behind the sofa. Id. at 3. The bag contained a small amount of a white, crystalline substance, and the sides of the bag were covered in a white residue. Id. Deputy Forrester opened the bag, and he associated the chemical odor emanating from the bag with methamphetamine. Id. at 27. Using two different field test kits, he analyzed the contents of the bag; both tests were positive for the presence of methamphetamine. Id. at 2-3.

While he was fishing, Mr. Goss received a telephone call that police officers were at his residence. Dkt. # 84-8, at 14. He returned in his truck, with the boat towed behind. Id. at 16. He parked the truck and boat in front of a relative's residence, which is located "next door to the house that's next door."[4] Dkt. # 74-2, at 14. Officers searched a travel trailer outside the home, Dkt. # 78-3,

---

[4]      Defendants emphasize that Mr. Goss parked "as close as [he] could get" when he arrived. Dkt. # 74-2, at 14. There is no conflicting evidence in the record of the location of the parked truck and boat, and the Court will accept plaintiffs' statement of location.

at 31, and, after Mr. Goss arrived, the officers also searched his boat and truck. Id. at 23. No drugs or contraband were found during the search other than the plastic bag, although the officers did discover several firearms in the house and one in the boat. Id. at 23, 24. Deputy Forrester arrested both plaintiffs. Id. at 31. After calling Lieutenant Ruhman and describing the situation, Deputy Forrester seized all of plaintiffs' firearms, as well as the truck and boat. Id. The seized items were taken to the CCSO, where Deputy Forrester performed an inventory. Id. at 23-24.

Plaintiffs were booked early in the morning on April 1, 2012, into the Creek County Criminal Justice Center (the CCCJC). Dkt. # 84-8, at 20. Prior to being moved to her cell, Mrs. Goss was provided with inmate clothing, size 6XL; this was the largest size available, and Mrs. Goss was given the only available set of clothing in that size. Dkt. # 84-7, at 7-8. Mrs. Goss suffered from diabetes, and one of the consequences of Mrs. Goss's condition was that she was occasionally unable to control her bladder. Dkt. # 78-12, at 1. In Mrs. Goss's detention area, restroom facilities were shared, and inmates were required to wait to use the restroom or shower. Dkt. # 84-7, at 13. Relatively early in her detention, Mrs. Goss urinated on herself while waiting to use the toilet. Dkt. # 78-12, at 1. She wore the same clothes for the duration of her detention, even after urinating in them. Id.

Mr. Goss was also moved to a detention area in the CCCJC. Dkt. # 78-7, at 9. He suffered from various ailments, including post-traumatic stress disorder, pain, nerve damage, and depression. Id. at 5. However, officers did not collect his medications when they arrested him, nor when he asked for them while he was being booked. Id. at 9. Although he made several requests, he was not provided with his medications at any point during the detention. Id. at 8, 10-11. As a result, Mr. Goss experienced some pain while in the CCCJC, id. at 5, but his physician told Mr. Goss that he

suffered no lasting damage from missing his medications. Dkt. # 84-8, at 13. While preparing to take a shower during his detention, Mr. Goss was punched by another inmate. Dkt. # 78-7, at 12. Mr. Goss returned the blow, and the other inmate thereafter sought the guards' protection, claiming an attack by several inmates. Dkt. # 84-8, at 32. The unit was locked down by CCCJC officials soon after. Id. at 34-35. Mr. Goss did not report either his role in the altercation or his bruised knuckles. Id. Plaintiffs were released on bail on April 3, 2012, the third day of their detention. Dkt. # 78-7, at 9. On April 10 and 11, the district attorney's office filed criminal informations against Mr. and Mrs. Goss, respectively, charging each with possession of a controlled dangerous substance, maintaining a place for keeping or selling a controlled substance, and possession of a firearm during the commission of a felony. Dkt. ## 74-12, 74-13.

During the relevant time period, Lieutenant Ruhman was responsible for the evidence room at the CCSO, and part of his duties included taking drug samples to the Oklahoma State Bureau of Investigations (OSBI) laboratory for testing. Dkt. # 78-8, at 2. He was also responsible for delivering copies of the results to the officers directly responsible for investigations. Id. at 4. The results of the testing were always sent to the Creek County District Attorney's office, as well as to Lieutenant Ruhman. Dkt. Id. at 3. On May 17, 2012, Lieutenant Ruhman submitted to the OSBI laboratory a sample of the substance found in plaintiffs' residence. Id. at 6. On June 4, 2012, the laboratory transmitted its results, which stated that the substance was not a controlled dangerous substance. Id. at 7. Lieutenant Ruhman gave a copy of these results to Deputy Forrester, id. at 9, although Deputy Forrester did not read them at the time. Dkt. # 78-3, at 9. Lieutenant Ruhman did not separately notify the district attorney's office of the results. Dkt. # 78-8, at 8. At some point thereafter, one of the prosecuting attorneys asked Lieutenant Ruhman to have the substance re-tested. Dkt. # 84-14,

at 15. However, when he attempted to do so, the OSBI laboratory technician with whom he spoke told him that retesting would not be possible. Dkt. # 84-15. Plaintiffs' attorneys requested all discovery on May 3, 2012, but the laboratory results were never produced. Dkt. ## 78-10, at 1, 78-11, at 1. Prior to defendant's preliminary hearing on August 15, 2012, a prosecuting attorney informed Deputy Forrester of the laboratory results. Dkt. # 84-3, at 13. The district attorney's office dismissed all charges against plaintiffs on August 15, 2012. Dkt. # 86-13.

On August 20, 2012, Mr. Goss retrieved the property that had been kept as evidence by the CCSO, including the boat and firearms. Dkt. # 84-8, at 36. He did not recover the truck, which had been released to American Security, the holder of the note, after Mr. Goss failed to make the necessary payments. Dkt. ## 84-8, at 4, 84-12, 84-13. The parties dispute whether deputies seized additional personal property that had been inside the truck, including camping gear, fishing gear, personal electronics, and a portable generator. Compare Dkt. # 78, at 24, with Dkt. # 84, at 22. For purposes of this opinion, the Court will assume that such property did exist. The boat, as returned, had several holes in its hull that rendered it unable to float. Dkt. # 78-14, at 2.

Prior to the events of March 31, 2012, Deputy Forrester had been a law enforcement officer for more than seven years. Dkt. # 86-4, at 3. He graduate from a police academy, and he completed more than one thousand hours of training as a law enforcement officer on a wide variety of topics. Id. at 8-9; see also Dkt. # 74-3, at 33. He had been certified as a Drug Recognition Expert, and he had additional training on preparation of affidavits, impoundment and inventory of vehicles, and drug kits. Dkt. # 86-5, at 1. However, he had been disciplined three times by his superiors, twice for failing to complete paperwork and once for failing to enter photographs into evidence. Dkt. # 78-1,

at 5-7. Deputy Forrester's employment was terminated by the CCSO at some point after September 11, 2012, for gross misconduct unrelated to this case. Dkt. # 78-1, at 9-11.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review,

the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

The Court addresses first plaintiffs' claims under 42 U.S.C. § 1983. The statute provides that "[e]very person who . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) "that the alleged violation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988) (citations omitted). However, in this case plaintiffs have not sued the individuals directly responsible for the alleged constitutional violations; instead, they have sued the sheriff and county that employ and pay those individuals.[5] "Section 1983 will not support a claim based on a *respondeat superior* theory of liability." Polk Cnty. v. Dodson, 454 U.S. 312, 325 (1981) (citations omitted). In the case of a municipal entity, the "under color of state law" element requires that the constitutional deprivation occurred pursuant to official policy or custom. Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 694 (1978). A municipal entity may be held liable for an act it has officially sanctioned, or for the actions of an official with final policymaking authority. Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 482-83 (1986); see also City of St. Louis v. Praprotnik, 485 U.S. 112, 127-28 (1988). A plaintiff "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct

---

[5]     Sheriff Davis is sued only in his official capacity as Sheriff of Creek County, Oklahoma. At no point do plaintiffs allege that Sheriff Davis had any individual responsibility for the events described in the second amended complaint.

causal link between the municipal action and the deprivation of federal rights." Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir.1998) (quoting Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 404 (1997)).

In order to show that the alleged constitutional deprivation occurred pursuant to an official policy, plaintiff must show that there was a "statement, ordinance, regulation, or decision officially adopted and promulgated by [a municipality's] officers." Lankford v. City of Hobart, 73 F.3d 283, 286 (10th Cir. 1996) (alterations in Lankford) (internal citations omitted). Even in the absence of an official policy, "a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law." Praprotnik, 485 U.S. at 127 (internal quotations omitted). Generally, "allegations of an isolated incident are not sufficient to show the existence of a custom or policy." Reed v. Ottawa Cnty. Sheriff's Dep't., 2010 WL 5209260, *2 (N.D. Okla. Dec. 16, 2010) (citing Fraire v. City of Arlington, 957 F.2d 1268, 1278 (5th Cir. 1992)).

### 1. Board Liability Under § 1983

Before a substantive analysis of plaintiffs' claims, the Court must first determine if the Board is a proper defendant under § 1983. Plaintiffs conflate the two defendants, ascribing liability equally for each § 1983 claim in the second amended complaint. See, e.g., Dkt. # 47, at 20, 27, 30. The Board argues that it is not properly the object of plaintiffs' federal claims, and that the proper defendant, Sheriff Davis, is already a party to this case. Dkt. # 74, at 25. For that reason, it asserts that summary judgment on the federal claims should be granted in its favor. Id. Plaintiffs respond that Creek County is a proper defendant under § 1983, and that Oklahoma law requires that suits

against a county be made against the Board of County Commissioners of that county. Dkt. # 88, at 30.

It is true, as plaintiffs argue, that Oklahoma requires suits against its counties to name the Board of County Commissioners as the defendant. OKLA. STAT. tit. 19, § 4. However, plaintiffs' argument that § 4 requires the presence of the Board in this case is misplaced. Plaintiffs seem to believe that the Board is arguing that it is not the proper entity to be named in suits against the county; in fact, the Board is arguing that all of plaintiffs' federal claims are aimed at Sheriff Davis as the official representative of the CCSO, not at the county at all. "The County may be held liable under 42 U.S.C. § 1983 only for its own unconstitutional or illegal policies," not for the acts of others. Barney, 143 F.3d at 1307 (citing Monell, 436 U.S. at 694). As this Court has previously written, a Board of County Commissioners "is statutorily separate and distinct from the independently elected sheriff." Beers v. Ballard, 04-CV-0860-CVE-SAJ, 2005 WL 3578131, at *6 (N.D. Okla. Dec. 29, 2005). The powers of the two entities, as well as their respective spheres of influence, may be related, but they are not redundant. Compare OKLA. STAT. tit. 19, §§ 3, 339, with OKLA. STAT. tit. 19, § 547. The Tenth Circuit, interpreting Oklahoma law, agrees: "[T]he Board [of County Commissioners] has no statutory duty to hire, train, supervise or discipline the county sheriffs or their deputies." Meade v. Grubbs, 841 F.2d 1512, 1528 (10th Cir. 1988), abrogated on other grounds by Ashcroft v. Iqbal, 556 U.S. 662 (2009); accord Bryson v. Okla. Cnty. ex rel. Okla. Cnty. Det. Ctr., 2011 OK CIV APP 98, ¶ 12, 261 P.3d 627, 632. There are occasions when a suit against a Board of County Commissioners regarding the actions of a sheriff's deputies could be correct. See Meade, 841 F.2d at 1528 (noting that such a suit would be possible if "the Commissioners voluntarily undertook responsibility for hiring or supervising county law

enforcement officers"); see also Jantzen v. Hawkins, 188 F.3d 1247, 1259 (10th Cir. 1999) (finding no reason to hold a Board of County Commissioners responsible where the sheriff was not reporting to, controlled by, or executing an official policy of the Board). Yet even when the evidence is viewed in the light most favorable to plaintiffs, summary judgment for the Board is required here. The second amended complaint is completely devoid of any reference to the Board itself, its individual members, or its employees. Plaintiffs present no policies, customs, or other legal justifications, outside of their reference to Title 19, § 4, showing why the Board is responsible for the allegedly unconstitutional acts of Sheriff Davis, his deputies, or the jail officials in his employ. Thus, the Board is entitled to summary judgment on all of plaintiffs' claims under § 1983.

2. Sheriff Davis's Liability Under § 1983

Plaintiffs allege claims under § 1983 against Sheriff Davis in his official capacity, which are claims against the county for municipal liability. See Meade, 841 F.2d at 1529. Under Monell and its progeny, municipal liability requires that plaintiffs first demonstrate that they suffered some violation of rights protected by the Constitution. Monell, 436 U.S. at 690. If such violations exist, plaintiffs must then prove that the violation was the result of a municipal custom or policy. Id. at 694. In the second amended complaint, plaintiffs alleged violations of the Fourth, Fifth, and Fourteenth Amendments. The second amended complaint can be read as making the following arguments: the search warrant secured by Deputy Forrester was invalid, in violation of the Fourth Amendment; the search of plaintiffs' home and vehicles offended the Fourth Amendment; plaintiffs' arrest was without probable cause in violation of the Fourth Amendment; the seizure of plaintiffs' property following their arrest was unreasonable and in violation of the Fourth Amendment; the conditions that Mrs. Goss endured during her detention violated the Fourteenth Amendment; the

failure to provide Mr. Goss with necessary medications while detained violated the Fourteenth Amendment; the failure to protect Mr. Goss from another inmate violated the Fourteenth Amendment; the CCSO deputies' failure to give the OSBI report directly to the Gosses' defense counsel constituted a failure to provide exculpatory evidence, in violation of the Fifth and Fourteenth Amendments; and plaintiffs' continued prosecution after defendants' receipt of the OSBI report was malicious, in violation of the Fourth Amendment.

### A. Alleged Constitutional Violations

In order to succeed on their claims under § 1983, plaintiffs must first show that their constitutional rights were violated. Plaintiffs have alleged nine constitutional violations, encompassing claims under the Fourth, Fifth, and Fourteenth Amendments.

### 1. The Search Warrant

Chronologically, plaintiffs' first alleged constitutional violation concerns the validity of the search warrant executed upon their residence. The Fourth Amendment, protecting the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," requires that "no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. "Officers executing search warrants on occasion enter a house when residents are engaged in private activity; and the resulting frustration, embarrassment, and humiliation may be real . . . . When officers execute a valid warrant and act in a reasonable manner to protect themselves from harm, however, the Fourth Amendment is not violated." L.A. Cnty., Cal. v. Rettele, 550 U.S. 609, 615-16 (2007). However, "a violation of the warrant requirement is itself a violation of the Fourth Amendment." Cassady v. Goering, 567 F.3d 628, 637 (10th Cir. 2009).

"The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate." <u>Maryland v. Garrison</u>, 480 U.S. 79, 85 (1987). Plaintiffs' invalid warrant argument is three-fold: Deputy Forrester did not personally meet the informant who provided the tip, instead relying on Deputy Brewer's interview; there was a discrepancy between the affidavit and the warrant as to the physical address of the home to be searched; and the affidavit Deputy Forrester provided to Judge Vassar omitted material facts. Dkt. # 78, at 26-29.

The fact that Deputy Forrester did not personally meet or speak to the informant does not render the warrant invalid. The Fourth Amendment requires officers to demonstrate that they have probable cause to search before a warrant will issue. U.S. Const. amend. IV. Under the fellow officer rule, also called the collective knowledge rule, information shared between officers is pooled for purposes of determining probable cause. <u>United States v. Chavez</u>, 534 F.3d 1338, 1345 (10th Cir. 2008); <u>Karr v. Smith</u>, 774 F.2d 1029, 1032 (10th Cir. 1985) ("Under the fellow officer rule, Officers Lemmon and Smith are deemed to have whatever knowledge Sergeant Miller had. Therefore, the probable cause which existed for Sergeant Miller's police report extends to the arrest made by Officers Lemmon and Smith."). Although Deputy Forrester did not speak to the informant, Deputy Brewer did, and he informed Deputy Forrester about the contents of the conversation. Dkt. # 78-3, at 14-15. Deputy Forrester could therefore include the knowledge gained from the informant in the affidavit that he presented to Judge Vassar.

Moreover, officers can rely on a judge's determination of whether the information they have provided is sufficient to show probable cause. <u>United States v. Williams</u>, 897 F.2d 1034, 1038-39 (10th Cir. 1990). The affidavit that Deputy Forrester presented to Judge Vassar in support of the

warrant repeatedly states that the information was gained through a conversation between Deputy Brewer and an informant. Dkt. # 84-4, at 2. Deputy Forrester stated in his deposition that, while he was standing with Judge Vassar, he contacted Deputy Brewer by phone to acquire supplemental information. Dkt. # 78-3, at 14. Thus, the fact that Deputy Forrester was relying on Deputy Brewer was not hidden from Judge Vassar, and the judge's determination of probable cause can therefore be assumed to have taken into account Deputy Forrester's reliance on Deputy Brewer. See United States v. Cardall, 773 F.2d 1128, 1133 (10th Cir. 1985) ("When a warrant has issued, the legal sufficiency of the underlying affidavit has already been determined by the magistrate, and the magistrate's determination is entitled to credence.").

Also unconvincing is plaintiffs' argument that the search warrant is invalid because of an address discrepancy between the affidavit and the warrant. The Fourth Amendment requires a warrant to "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. In the Tenth Circuit, "[t]he test for determining the adequacy of the description of the location to be searched is whether the description is sufficient 'to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched.'" United States v. Lora-Solano, 330 F.3d 1288, 1293 (10th Cir. 2003) (quoting United States v. Pervaz, 118 F.3d 1, 9 (1st Cir. 1997)). "A technically wrong address does not invalidate a warrant if it otherwise describes the premises with sufficient particularity so that the police can ascertain and identify the place to be searched." Id. The affidavit states that the residence to be searched is located at 238 Navajo Place, Mannford, Oklahoma. Dkt. # 84-4, at 1. The search warrant states the address as 283 Navajo Place, Dkt. # 84-6, and plaintiffs actually resided at 283 Navajo Place. Dkt. # 78, at 8. Both the affidavit

and the search warrant included an identical description of the residence and directions to the residence from a local intersection. Dkt. # 84-4, at 1; Dkt. # 84-6. Even had the address on the warrant been incorrect, the description and directions would have sufficed to validate the warrant because there was no reasonable probability that a different residence would have been searched. See United States v. Garcia-Escalera, 998 F. Supp. 2d 1191, 1206-08 (N.D. Okla. 2014). However, the address on the warrant was correct, and the Court will not find a facially correct warrant invalid because of a typographical error in the underlying affidavit.

Plaintiffs next contention is that Deputy Forrester omitted material facts from his affidavit and that, had Judge Vassar been given all of the material facts, he would not have issued the warrant due to a lack of probable cause. Dkt. # 78, at 34. "[P]robable cause to issue a search warrant only exists when the supporting affidavit sets forth sufficient facts that would lead a prudent person to believe that a search of the described premises would uncover contraband or evidence of a crime." United States v. Rowland, 145 F.3d 1994, 1204 (10th Cir. 1998). The Tenth Circuit has held that it is a violation of the Fourth Amendment to "knowingly or recklessly omit from the affidavit information which, if included, would have vitiated probable cause." Wolford v. Lasater, 78 F.3d 484, 489 (10th Cir. 1996) (citing Stewart v. Donges, 915 F.2d 572, 581-83 (10th Cir. 1990)). "[I]n order to invalidate a warrant based on a reckless omission, the information excluded from the affidavit must be material to the magistrate judge's finding of probable cause." United States v. Kennedy, 131 F.3d 1371, 1377 (10th Cir. 1997).

The Court has reviewed the information in the affidavit, as well as the facts that plaintiffs claim were knowingly omitted,[6] and concludes that none of the omitted information was material to the probable cause determination. The information that plaintiffs claim is material relates to what the deputies did not know or had not done, but an affidavit need only inform the magistrate of what officers do know and have done. See Harman v. Pollock, 446 F.3d 1069, 1079 (10th Cir. 2006) ("The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate." (quoting Maryland v. Garrison, 480 U.S. 79, 85 (1987)). The omitted facts would not have affected Judge Vassar's probable cause determination, because the knowledge of unperformed investigative tasks would not have changed his conclusion that the information gained thus far met the probable cause standard. See United States v. Wright, 350 F. App'x 243, 249 (10th Cir. 2009)[7] (finding that the failure to list officers' unsuccessful investigative techniques, including the lack of surveillance or a controlled buy, in an affidavit did not affect the probable cause analysis); cf. Illinois v. Gates, 462 U.S. 213, 238 (1983) (requiring magistrates, as part of their probable cause determination, to make a "practical, common-sense decision whether . . . there is a fair probability that contraband or evidence

---

[6]    Specifically, the Court has considered the following facts. Deputy Forrester did not personally meet the informant. Dkt. # 78-3, at 17. However, Deputy Brewer told Deputy Forrester that Deputy Brewer and the informant had previously made a controlled purchase of illegal drugs. Dkt. # 84-3, at 27. Deputy Brewer was unsure of the physical address of the residence to be searched, and he performed no investigation beyond driving the informant to Mannford to locate the residence. Dkt. # 78-5, at 3-4. Deputy Forrester drove past the residence, but he did not stop to verify the address as 283 Navajo Place, rather than 238 Navajo Place. Dkt. # 78-3, at 14. Deputy Forrester did not verify that Larry Tatro owns or occupies the residence. Id. Nor did Deputy Forrester conduct surveillance of the residence or perform an Internet search for ownership records for the residence. Id. at 14-15.

[7]    This and all other unpublished opinions are cited for their persuasive value. See 10th Cir. R. 32.1(A).

of a crime will be found in a particular place"). In fact, Judge Vassar did feel that he needed more information about Tatro before finding probable cause, and he requested it from Deputy Forrester prior to issuing the warrant. Dkt. #78-3, at 16. However, Judge Vassar did not request that Deputy Forrester provide any of the facts that plaintiffs claim are material. Plaintiffs' argument would have more merit if, for example, Deputy Forrester had in fact investigated further and found that Larry Tatro lived at a different residence in the same town. Cf. Wolford, 78 F.3d at 489 (holding that the omission of allegedly exculpatory facts did not invalidate warrant where the affidavit included other facts sufficient for probable cause); United States v. Troxel, 546 F. Supp. 2d 1235, 1246 (D. Kan. 2008) (holding that an officer's omission of a previously-conducted search was a material omission). Deputy Forrester did not take such an action, however, and Judge Vassar did not need additional facts beyond what he asked for to determine that probable cause existed. Thus, the information was not material to Judge Vassar's finding of probable cause, and as a result there was no violation of the Fourth Amendment. As none of plaintiffs' arguments as to the warrant are availing, the Court finds no violation of the Fourth Amendment as to the validity of the warrant.

## 2. The Arrest

Plaintiffs argue briefly that their arrest lacked a constitutional justification. An arrest is a seizure, subject to the Fourth Amendment protection against unreasonable seizures. U.S. CONST. amend. IV. A warrantless arrest is reasonable only "if [the officer] has probable cause to believe that person committed a crime." Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995); see also Dunaway v. New York, 442 U.S. 200, 213 (1979). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an

offense." Jones v. City & Cnty. of Denver, Colo., 854 F.2d 1206, 1210 (10th Cir. 1988) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)). As part of considering probable cause, officers may use and rely upon the results of field tests for narcotics. See United States v. Nicholson, 144 F.3d 632, 636 (10th Cir. 1998) (finding no invasion of a legitimate privacy interest in a field test for an illegal substance); United States v. Jacobsen, 366 U.S. 109, 124-25 (1984) (holding that the destruction of a small amount of material as part of a narcotics field test was reasonable under the Fourth Amendment). At the time of the arrest, Deputy Forrester knew the following: plaintiffs claimed to be the sole occupants of the residence, Dkt. # 78-7, at 7; inside the residence, a deputy found a bag containing a white crystalline substance, Dkt. # 78-3, at 3; the substance in the bag smelled, to Deputy Forrester, like methamphetamine, Dkt. # 78-3, at 27; the substance was field-tested using two different field test kits, id. at 2; and the substance tested positive for methamphetamine according to both kits, id. at 2-3. Based on those facts, the Court finds that Deputy Forrester had probable cause to believe that plaintiffs had committed the crime of possession of a controlled substance. His subsequent arrest of plaintiffs without an arrest warrant was, therefore, constitutionally valid.

### 3. The Extent of the Search

Plaintiffs contend that the scope of the officers' search expanded, to the point of offending the Fourth Amendment, in two ways: first, the search broadened beyond the face of the warrant because the warrant did not authorize a search of plaintiffs' travel trailer, truck, and boat; and second, the deputies had a duty to cease the search when it became evident that Larry Tatro did not reside at plaintiffs' home, yet they continued to search. The Fourth Amendment explicitly protects against unreasonable searches, in order to prevent officers "from generally rummaging through a

person's belongings." United States v. Guidry, 199 F.3d 1150, 1154 (10th Cir. 1999) (quoting

United States v. Hargus, 128 F.3d 1358, 1362 (10th Cir. 1997)). However, "it is generally left to the

discretion of the executing officers to determine the details of how best to proceed with the

performance of a search authorized by warrant—subject of course to the general Fourth Amendment

protection." Dalia v. United States, 441 U.S. 238, 257 (1979). Officers are "entitled to rely, in good

faith, on the magistrate's determination that these facts were sufficient to make out probable cause."

United States v. Williams, 897 F.2d 1034, 1038-39 (10th Cir. 1990); see also United States v. Leon,

468 U.S. 897, 921 (1984) ("It is the magistrate's responsibility to determine whether the officer's

allegations establish probable cause and, if so, to issue a warrant comporting in form with the

requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to

question the magistrate's probable-cause determination or his judgment that the form of the warrant

is technically sufficient."). Moreover, officers are presumed to have executed a search warrant in

good faith. United States v. Campbell, 603 F.3d 1218, 1230 (10th Cir. 2010).

Plaintiffs' argument that the search was unreasonably broad because it extended beyond the

residence to plaintiffs' travel trailer seems to ignore settled law.[8] A search warrant empowers

officers to search the described premises, including the curtilage of the premises, for the items

described in the warrant. United States v. Earls, 42 F.3d 1321, 1327 (10th Cir. 1994). The Tenth

Circuit has held that "outbuildings and vehicles within the curtilage of a residence are considered

---

[8]     Plaintiffs also argued in response to Sheriff Davis's motion for summary judgment that the
        search of Mr. Goss's person violated the constitution. Dkt. # 89, at 17. In making their
        argument, however, plaintiffs state that the search of Mr. Goss occurred after he was
        arrested. Id. Plaintiffs provide no argument as to why the well-known search incident to
        arrest exception to the warrant requirement would not apply here. See Arizona v. Gant, 556
        U.S. 332, 338 (2009).

part of that residence for purposes of a search warrant, and [the Tenth Circuit has] upheld searches of those buildings and vehicles even when not named in the warrant." United States v. Finnigin, 113 F.3d 1182, 1186 (10th Cir. 1997); see also United States v. Sturmoski, 971 F.2d 452, 458 (10th Cir. 1992) (upholding the search of a horse trailer located within the curtilage of the premises described in the warrant even though the trailer was not itself included in the warrant). Here, the search warrant described with particularity the plaintiffs' residence, and stated: "You are therefore commanded to make search of said person, vehicle and/or house, building and premises, the curtilage thereof and the appurtenances thereunto belonging . . . ." Dkt. # 84-6. The travel trailer was undisputedly within the curtilage of the home when it was searched. Dkt. # 78-3, at 31. Thus, the search of the travel trailer was valid under Tenth Circuit precedent and did not violate the Fourth Amendment.

However, the same is not true with regard to plaintiffs' truck and boat. Defendants make much of Mr. Goss's statement that he parked the truck "as close as [he] could get" to the residence. Dkt. # 74-2, at 14. However, Mr. Goss also stated that he parked the truck in front of his aunt's residence, which was located "next door to the house that's next door." Id. There is no evidence to contradict that the truck and boat were parked down the street from the residence. There is no indication that Mr. Goss ever pulled the truck and boat in front of his residence or into his driveway. Thus, the truck and boat were not within the curtilage of the residence. As the truck and boat were not named in the warrant, officers would have needed one of the established exceptions to the warrant requirement to search them. The automobile exception allows an officer to search a vehicle without a warrant when the officer has probable cause to believe that a vehicle contains contraband or evidence of a crime. United States v. Benard, 680 F.3d 1206, 1210 (10th Cir. 2012) (citing United

States v. Chavez, 534 F.3d 1338, 1343-45 (10th Cir. 2008)). "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." Chavez, 534 F.3d at 1344. As discussed above, the circumstances at the time would have given Deputy Forrester probable cause to arrest Mr. Goss. However, the probable cause to arrest was based on evidence found inside the residence itself. Dkt. # 78-3, at 3. Other than Mr. Goss's arrival in the truck and his occupation of the residence, there is no connection between the plastic bag and the truck or boat. Based on the totality of the circumstances, the Court finds that Deputy Forrester did not have probable cause to search the truck and boat. Thus, the automobile exception to the warrant requirement would not apply in this case. As no other exception to the warrant requirement seems to apply, Deputy Forrester should have sought a warrant before searching the truck and boat; his failure to do so is a violation of the Fourth Amendment.

Deputy Forrester did not violate the Fourth Amendment when he did not order the search discontinued, either after Mrs. Goss informed him that Larry Tatro did not reside at 283 Navajo place or after the drug dog did not alert inside the home. Plaintiffs cite Maryland v. Garrison, 480 U.S. 79 (1987), and Harman v. Pollock, 446 F.3d 1069 (10th Cir. 2006), for the proposition that Deputy Forrester should have stopped the search when they did not find Larry Tatro, the man listed on the warrant, at 283 Navajo Place. Dkt. # 78, at 36. However, the cases on which plaintiffs rely are distinguishable from the present case. In both Harman and Garrison, the officers searched what they knew to be separate residences not within the bounds of the search warrant: the second apartment on a floor where the warrant stated there was only one apartment, Garrison, 480 U.S. at 81; and a garage apartment with a separate address and mailbox from the residence named in the warrant, Harman, 446 F.3d at 1075. As the Tenth Circuit noted in Harman, "Garrison requires that

the officers were obligated to retreat as soon as they knew or reasonably should have known that there was a mistake, i.e., they were in the wrong residence." Id. at 1083 (citing Garrison, 480 U.S. at 87-88). Here, there is no question that Deputy Forrester and the other officers were searching the place named and described in the search warrant, 283 Navajo Place. Thus, Garrison and Harmon are factually distinguishable from the case at bar.

A case not cited by either party, Peterson v. Jensen, 371 F.3d 1199 (10th Cir. 2004), is closer to the facts of the present case than either Garrison or Harmon, although it too is distinguishable. In Peterson, officers executed a search warrant on plaintiffs' newly-leased residence, but the warrant stated that the officers were searching for the prior occupants. Peterson, 371 F.3d at 1201. The officers continued to search even after all persons in the residence, including plaintiffs, identified themselves as persons other than those named in the warrant. Id. at 1202. The Tenth Circuit held that the plaintiffs had stated a constitutional violation by alleging "that the defendants continued to search the premises after independently verifying that [those named by the warrant] had moved out of the apartment." Id. (emphasis in original). The message of Peterson is that officers cannot continue to search a residence for the object of their search after they have verified that the object is not present. In the case before this Court, however, the warrant authorized a search for "marijuana, fruits, instrumentalities, monies, records indicating the sales of illegal drugs and proof of residency," not a search for Larry Tatro. Dkt. # 84-6. As such, Deputy Forrester and the other officers did not exceed the scope of the warrant by continuing to search the residence for those items named in the warrant, even though Tatro was not found at the residence. Likewise, the officers did not exceed the scope of the warrant when they continued to search after the drug dog did not alert to the presence of narcotics because, aside from the fact that some of the objects for which they were searching were

not narcotics, officers are not required to revolve their search around canine alerts. See United States v. Ramirez, 342 F.3d 1210, 1213 (10th Cir. 2003) ("We will not require investigators to cease an otherwise reasonable investigation solely because a dog fails to alert . . . ."). Neither of plaintiffs' arguments related to the scope of the search of their residence amounts to a constitutional violation.

### 4. The Seizure of Property

Plaintiffs argue that their property, particularly their truck, boat, and firearms,[9] was seized in violation of the Fourth Amendment. Just as the Constitution protects against unreasonable seizures of persons, it also protects against unreasonable seizures of property. U.S. Const. amend. IV. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113, (10th Cir. 1984). "What is reasonable depends upon all of the circumstances surrounding the . . . seizure and the nature of the . . . seizure itself." United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985) (citing New Jersey v. T.L.O., 469 U.S. 325, 337-342 (1985)). "Objects not named in a search warrant, discovered in a lawful search under the warrant, if such objects are instrumentalities and means by which the crime was committed, may be seized." United States v. Nolan, 416 F.2d 588, 593 (10th Cir. 1969). "The mandates of the Fourth Amendment are complied with when there exists a reasonable nexus between the item to be seized and the criminal behavior alleged." Shaffer v. Wilson, 523 F.2d 175, 179 (10th Cir. 1975).

---

[9]     Plaintiffs also enumerate a number of other items of personal property seized, including a portable generator, fishing and camping equipment, and an electronic reader. Dkt. # 78-14. According to plaintiffs, these items were in the truck or boat, Dkt. # 78, at 18, Dkt. # 78-14, at 2. The seizure of these smaller items is therefore part and parcel of the seizure of the larger, and the Court will refer only to the truck and boat.

Under these precedents, the seizure of the firearms in the residence did not violate the Fourth Amendment, but the seizure of the truck, boat, and one firearm in the boat did. The context of the seizure of the firearms in the residence demonstrates its reasonableness. At the time of the seizure, the officers had tested the contents of the plastic bag and, according to the field test kits, the contents were presumptively methamphetamine. Dkt. # 78-3, at 2-3. Officers had also discovered a number of firearms by that point. Id. at 23, 24. The officers would have known that possession of methamphetamine, a Schedule II drug, is a felony under Oklahoma law, OKLA. STAT. tit. 63, § 2-402, and that possession of a firearm during the commission of a felony is a crime under Oklahoma law. OKLA. STAT. tit. 21, § 1287. Thus, it would have been reasonable at that point to seize the firearms in the residence as instrumentalities of the commission of a crime.

However, it was not reasonable to seize the truck, boat, or firearm in the boat. They were not among the objects named in the warrant. Dkt. # 84-6. At the time of the seizure, the truck and the boat had already been searched thoroughly, and the search had revealed only one firearm, which officers had removed. Dkt. # 78-3, at 23-24. The plastic bag was recovered inside the house, not in the boat or truck. Id. at 3. Under these circumstances, the boat, truck, and the one firearm in the boat were neither instrumentalities or means of the crimes for which plaintiffs were arrested, see Nolan, 416 F.2d at 593, nor was there a reasonable nexus between the boat or truck and the crimes alleged. See Shaffer, 523 F.2d 179. It is not reasonable to seize property, without a warrant, unless there exists some connection between the property and the alleged misconduct, and the Court can find no such connection here. The seizure of plaintiffs' boat and truck, as well as the one firearm and any other personal property contained therein, violated the Fourth Amendment; the seizure of the firearms in the residence did not.

## 5. The Conditions of Confinement - Mrs. Goss

Plaintiffs' next set of asserted constitutional violations relates to their three-day detention in the CCCJC. Dkt. # 47, at 30. The rights of pretrial detainees, such as plaintiffs, are protected under the Fourteenth Amendment, but for § 1983 purposes the protections are the same as those granted to prisoners under the Eighth Amendment. Olsen v. Layton Hills Mall, 312 F.3d 1304, 1315 (10th Cir. 2002). "Prison officials are required to provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety." Barney v. Pulsipher, 143 F.3d 1299, 1310 (10th Cir. 1998). However, "the Constitution does not mandate comfortable prisons." Rhodes v. Chapman, 452 U.S. 337, 349 (1981). Plaintiffs must meet two requirements to show a constitutional violation: "[f]irst, the deprivation alleged must be objectively 'sufficiently serious,' depriving the inmate of 'the minimal civilized measure of life's necessities,'" id. (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)); and second, the prison official must have acted with "deliberate indifference." Farmer v. Brennan, 511 U.S. 825, 834 (1994). Deliberate indifference requires "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. Moreover, the duration of the incarceration plays a strong role in whether the conditions violate the Constitution. Barney, 143 F.3d at 1311-12 (citing Hutto v. Finney, 437 U.S. 678, 686-87 (1978) ("[A] filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months.")).

Plaintiffs contend that Mrs. Goss's experience during her three-day detention rises to the level of a constitutional violation. They point specifically to the following facts: her clothes were

not large enough to cover her body; she was forced to wait in line to use the restroom, and as a result she urinated in her clothing; and she was not provided with new clothing, resulting in her wearing urine-stained clothing for the remainder of the incarceration. Dkt. # 78, at 37. The fact that the clothes did not completely cover Linda Goss's body is not sufficient to support her claim, as it is not sufficiently serious to satisfy the first requirement. The CCCJC provided clothing for Mrs. Goss to wear, and the clothing provided was the largest size of inmate clothing available. Dkt. # 84-7, at 7-8. The jail only had one set of clothing in that size. Id. The top fit, "barely," id. at 7, but the bottoms did not entirely cover her backside. Id. Given that their detention lasted only three days and that the jail did not have a larger size of clothing to give her, the failure to provide properly-fitting inmate clothing does not rise to the level of a constitutional violation as a matter of law. Cf. Carter v. Miller, No. 3:08-CV-048 RM, 2008 WL 3086731 (N.D. Ind. July 31, 2008) (finding no violation where prisoner was given overly large clothing, even when the prison had clothing of the correct size).

The Court will assume without analysis that the remaining facts do state a sufficiently serious deprivation. See DeSpain v. Uphoff, 264 F.3d 965, 974 (10th Cir. 2001) ("[E]xposure to human waste carries particular weight in the conditions calculus."). Even so, plaintiffs' claim fails on the second prong of the analysis, the requirement for deliberate indifference. Deliberate indifference first requires knowledge of a serious deprivation, Farmer, 511 U.S. at 837, and an official's knowledge can be shown either through direct proof or through circumstantial evidence showing the risk of harm was obvious. DeSpain, 264 F.3d at 975. The Court has reviewed the exhibits, including the excerpts of the deposition testimony of Mrs. Goss, and nowhere is there any evidence that Mrs. Goss told jail officials about her need for new clothing. Nor is there evidence or testimony to show that the condition of her clothing was or should have been obvious to CCCJC officials (e.g.,

by stains, by smell, etc.). In her affidavit, Mrs. Goss states that "[d]espite wetting my pants and being humiliated by this fact, I had to wear the same set of clothes during my three day incarceration because I was told from the beginning of my incarceration that this single pair of pants was the only set of pants they had for me to wear." Dkt. # 78-12. It may be true that, after being told about her situation, the CCCJC officials would have taken no action for precisely the reason Mrs. Goss states. That, however, is not the standard. Plaintiffs have provided no evidence, direct or circumstantial, from which the Court can infer that any CCCJC official had the requisite knowledge for deliberate indifference. As such, the evidence present regarding the conditions of Mrs. Goss's confinement do not establish a violation of the Fourteenth Amendment.

### 6. Deprivation of Medical Care - Mr. Goss

Plaintiffs assert that the denial of Mr. Goss's medication for the duration of his three-day detention constitutes a violation of his constitutional rights. Denial of medical care can be a violation of a person's Eighth Amendment right to be free of cruel and unusual punishment, with that right made applicable to the states by the Fourteenth Amendment. Estelle v. Gamble, 429 U.S. 97, 101 (1976). "Prison officials violate the Eighth Amendment's prohibition against cruel and unusual punishment when they act deliberately and indifferently to serious medical needs of prisoners in their custody." Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999) (citing Estelle, 429 U.S. at 104-06). A medical need is objectively serious if "it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. (citing Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980)). Deliberate indifference requires "the official [to] both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

Farmer, 511 U.S. at 837. "The subjective component is met if a prison official 'knows of and disregards an excessive risk to inmate health or safety.'" Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000) (quoting Farmer, 511 U.S. at 837). "[A] delay in medical care 'only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm.'" Garrett v. Stratman, 254 F.3d 946, 950 (10th Cir. 2001); see also Whitington v. Ortiz, 472 F.3d 804, 808 (10th Cir. 2007).

It is the requirement of substantial harm that is plaintiffs' stumbling block here. The Court assumes without deciding that Mr. Goss's diagnosed conditions--post-traumatic stress disorder, pain, nerve damage, and depression, Dkt. # 78-7, at 5--are sufficiently serious. Likewise, there is certainly evidence that Mr. Goss told jail officials repeatedly, both at his booking and during his detention, that he needed to take medication. Dkt. # 78-7, at 8, 10-11. He did not receive his medication after repeatedly asking for it and explaining its purpose, satisfying the requirement of deliberate indifference on the part of CCCJC officials. However, plaintiffs have not presented any evidence of "lifelong handicap, permanent loss, or considerable pain" needed to satisfy the substantial harm requirement. Garrett, 254 F.3d at 950 (citing Oxendine v. Kaplan, 241 F.3d 1272, 1278 (10th Cir. 2001)); see also Lindwurm v. Wexford Health Sources, Inc., 84 F. App'x 46, 48 (10th Cir. 2003). In his deposition, Mr. Goss stated that there was no permanent damage as a result of not taking his medications for the three days he was in jail. Dkt. # 84-8, at 13. While he testified to wishing he had his pain medication while in jail, Dkt. # 78-7, at 5, this is not enough to show substantial harm. Thus,

plaintiffs have not presented the evidence necessary to show a violation of Mr. Goss's Fourteenth

Amendment rights.[10]

7. Inmate Safety - Mr. Goss

Plaintiffs final argument under the Fourteenth Amendment relates to the attack on Mr. Goss

by another inmate while he was detained. Dkt. # 47, at 30-31. As discussed above, the rights of

pretrial detainees are protected under the Fourteenth Amendment, but courts assess those protections

in light of Eighth Amendment standards. Olsen v. Layton Hills Mall, 312 F.3d 1304, 1315 (10th Cir.

2002). "Prison officials have a duty . . . to protect prisoners from violence at the hands of other

prisoners." Farmer, 511 U.S. at 833. To show an Eighth Amendment violation of this right to inmate

safety, "a plaintiff 'must show that he is incarcerated under conditions posing a substantial risk of

serious harm,' the objective component, and that the prison official was deliberately indifferent to

his safety, the subjective component." Benefield v. McDowall, 241 F.3d 1267, 1271 (10th Cir. 2001)

(quoting Farmer, 511 U.S. at 834). "Mere negligence does not constitute deliberate indifference;

deliberate indifference is equivalent to recklessness in this context." Smith v. Cummings, 445 F.3d

1254, 1258 (10th Cir. 2006).

Plaintiffs' safety claim fails both prongs of the analysis. In Cummings, a prisoner asserted

that he faced a serious risk of harm because during required visits to the medical facility he had to

proceed from protective housing through the general population. Id. The Tenth Circuit found that

---

[10]     Although the Court does not reach the issue, it is worth noting that plaintiffs also present
absolutely no evidence linking any constitutional violation at the CCCJC to Sheriff Davis
in his official capacity. The only official jail policy on point mandates that inmates be
provided with medical services, including medication, as necessary. Dkt. # 86-11. Plaintiffs
do not put forth any policy, custom, or practice to show liability under Monell, nor do they
allege any failure to train or supervise jail officials. Thus, plaintiffs § 1983 claim would fail
even if the facts demonstrated substantial harm.

30

there was no evidence of an objectively serious risk of harm where prison officials took precautionary measures and where there was no evidence of past incidents during medical visits. Id. at 1258-59. As in Cummings, plaintiffs have presented no evidence that Mr. Goss faced an objectively serious risk during his detention. For example, there is no evidence that violence among inmates was a general problem at the CCCJC. See Winton v. Bd. of Comm'rs of Tulsa Cnty., Okla., 88 F. Supp. 2d 1247, 1267 (N.D. Okla. 2000) (refusing to grant summary judgment where plaintiffs presented evidence of an "epidemic" of inmate-on-inmate violence). Nor is there evidence that the other inmate was prone to violence, or that Mr. Goss was likely to be a target of violence. See, e.g., Carter v. Galloway, 352 F.3d 1346 (11th Cir. 2003); Walsh v. Mellas, 837 F.2d 789 (7th Cir. 1988).

Also lacking is any evidence of deliberate indifference on the part of CCCJC officials. The Tenth Circuit found no deliberate indifference in Verdecia v. Adams, 327 F.3d 1171 (10th Cir. 2003), where prison officials knew of violence between two opposing gangs but unknowingly put members of the rival gangs in the same cell. Id. at 1175-76. The appellate panel rejected Verdecia's argument that prison officials knew of prior altercations between the gangs and, for that reason, should have known about the possibility for violence, even though they did not know the gang affiliations of the specific prisoners involved. Id. at 1176. Plaintiffs here have even less of an argument than the plaintiff in Verdecia, as they present no evidence that any CCCJC official should have known about a potential attack but did nothing to prevent it. Plaintiffs provide no evidence of Mr. Goss's interactions with the other inmate or CCCJC officials before the attack. After the attack, Mr. Goss did not request medical attention. Dkt. # 84-8, at 35. The only person who seemed to speak to prison officials about the incident was the other inmate, who asked to be put in protective custody. Dkt. # 84-8, at 32. The unit was locked down, Dkt. # 84-8, at 34-35, indicating that CCCJC officials

were taking precautionary measures against further violence. As discussed above, there cannot be deliberate indifference without knowledge of the risk of harm. Plaintiffs have failed to present any evidence that there was either an objectively substantial risk of serious harm to Mr. Goss or that CCCJC officials were deliberately indifferent to that risk. Accordingly, there was no constitutional violation relating to the attack on Mr. Goss.

## 8. Production of Exculpatory Evidence

Plaintiffs allege that the Deputy Forrester and Deputy Ruhman's failure to provide the OSBI report to defense counsel amounted to a violation of Brady v. Maryland, 373 U.S. 83 (1963).[11] The Tenth Circuit has held that a violation of Brady can serve as the basis for a claim under § 1983. Tiscareno v. Anderson, 639 F.3d 1016, 1023, opinion vacated in part on other grounds, 421 F. App'x 842 (10th Cir. 2011) ("Nearly all of our sister circuits have also determined that police may be liable under § 1983 for failure to turn over *Brady* evidence"). However, plaintiffs misapprehend what Brady protects, namely a criminal defendant's right to a fair trial. United States v. Bagley, 473 U.S. 667, 675 (1985) ("[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial."); see also United States v. Agurs, 427 U.S. 97, 103 (1976) ("The rule of Brady v. Maryland arguably applies in three quite different situations. Each involves the discovery, after trial

---

[11]    Sheriff Davis argues that plaintiffs did not state this claim in their second amended complaint, and "[i]nsertion of new theories of relief into summary judgment pleadings are generally prohibited." Dkt. # 86, at 11 (citing Spencer v. Wal-Mart Stores, Inc., 203 F. App'x 193, 196 n.2 (10th Cir. 2006)). Plaintiffs respond that, while it does not use the term "Brady violation," the complaint is rife with references to exculpatory evidence, and during their depositions Deputy Forrester, Deputy Ruhman, and Sheriff Davis were each asked about policies relating to exculpatory evidence. Dkt. # 93, at 2-4. Because the Court grants summary judgment to Sheriff Davis on other grounds, it need not consider this argument.

of information which had been known to the prosecution but unknown to the defense." (emphasis

added)). Plaintiffs never went to trial, so there is no violation of <u>Brady</u> here. <u>Becker v. Kroll</u>, 494

F.3d 904, 924 (10th Cir. 2007) ("Becker never proceeded to trial, and she cannot therefore rest her

§ 1983 claims on a *Brady* violation.").

9. Malicious Prosecution

The Tenth Circuit has recognized malicious prosecution as a cognizable claim under § 1983,

holding that it implicates individuals' Fourth Amendment right to be free of unreasonable seizures.

<u>Taylor v. Meacham</u>, 82 F.3d 1556, 1561 (10th Cir. 1996). Plaintiffs may seek relief not only from

prosecutors but also from police officers. <u>Pierce v. Gilchrist</u>, 359 F.3d 1279, 1292-93 (10th Cir.

2004) ("If police officers have been instrumental in the plaintiff's continued confinement or

prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors,

or magistrates to confine or prosecute him. They cannot hide behind the officials whom they have

defrauded." (quoting <u>Jones v. City of Chi.</u>, 856 F.2d 985, 994 (7th Cir. 1988))). Presumably, then,

plaintiffs may also seek relief from the political subdivision that employs the officers by showing,

as with other claims under <u>Monell</u>, that the officers committed a constitutional violation and that

some policy or custom of the municipality caused the violation.

"[O]ur circuit takes the common law elements of malicious prosecution as the 'starting point'

for the analysis of a § 1983 malicious prosecution claim, but always reaches the ultimate question,

which it must, of whether the plaintiff has proven a constitutional violation." <u>Taylor</u>, 82 F.3d at

1561. In the Tenth Circuit, "a § 1983 malicious prosecution claim includes the following elements:

(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action

terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued

33

confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." Wilkins v. DeReyes, 528 F.3d 790, 799 (10th Cir. 2008) (citing Novitsky v. City of Aurora, 491 F.3d 1244, 1258 (10th Cir. 2007)). Additionally, "where criminal charges were brought but dismissed before trial, [plaintiffs] must allege a violation of the Fourth Amendment in order to proceed on a theory of § 1983 malicious prosecution." Becker v. Kroll, 494 F.3d 904, 919 (10th Cir. 2007). This case can be decided at the first element.[12]

> To prevail on a claim brought pursuant to § 1983, a plaintiff must demonstrate the defendant was both the but-for and proximate cause of the plaintiff's injury. Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006). Proximate cause can be established by showing the defendant set in motion events that he knew or should have known would cause the alleged deprivation of rights. Id. . . . [A]n officer typically does not proximately cause a malicious prosecution because the independent decisions of the prosecutor in bringing the charge and the court in issuing a indictment or warrant constitute superseding causes that break the chain of causation. [Taylor, 82 F.3d at 1564]. Nonetheless, officers are not shielded from liability if a causal connection can be established demonstrating that the prosecutor's and court's actions were not truly independent causes. [Pierce, 359 F.3d at 1292-93].

Calvert v. Ediger, 415 F. App'x 80, 83 (10th Cir. Mar. 4, 2011) (unpublished). A plaintiff can demonstrate the necessary causal link by showing that the officer made false or misleading statements, by establishing the officer's undue influence over the prosecutor, or by other means. Id. at 84.

Plaintiffs rest their claim of malicious prosecution primarily on two separate events: the failure of the Deputy Forrester and Deputy Ruhman to separately report the OSBI results to the

---

[12]    As the Court decides this case at the first element, it makes no finding about the other elements, notably the probable cause and malice elements.

prosecutor's office, and Deputy Ruhman's request that OSBI re-test the alleged methamphetamine.[13]

Dkt. # 78, at 39. However, plaintiffs have failed to provide any evidence showing that the behavior of the deputies had any causal relationship to the prosecuting authority's decisions to continue, and later to dismiss, the charges. Plaintiffs list as uncontroverted the fact that "[t]he OSBI crime lab transmitted its results by U.S. Mail to the Creek County Sheriff's Office addressed to Deputy Scott Forrester, and to the Creek County District Attorney's Office on June 4, 2012." Dkt. # 78, at 20 (emphasis added). In his deposition, Deputy Forrester stated that he first learned of the laboratory results from an assistant district attorney, Dkt. # 84-3, at 13, and Deputy Ruhman knew that the prosecutor's office had the information in the report because they asked him to re-test the sample. Dkt. # 78-8, at 10. While police officers have a duty to present potentially exculpatory evidence to a prosecutor when the prosecutor is unaware of the evidence, see Tiscareno v. Anderson, 639 F.3d 1016, 1023, opinion vacated in part on other grounds, 421 F. App'x 842 (10th Cir. 2011), the Court can find no duty to inform a prosecutor of evidence about which the prosecutor is already aware. Thus, the Court will not hold responsible the deputies, much less Sheriff Davis, for the actions of the prosecuting authority in not divulging the report to plaintiffs. Likewise, Deputy Ruhman testified that the request to re-test the sample came from one of the district attorneys. Dkt. # 78-8, at 10. No subsequent test was actually performed. Dkt. # 84-15. The Court concludes that plaintiffs have

---

[13]     Plaintiffs also rely on Deputy Forrester's actions related to the warrant, search, and seizure as sources for their claim. However, each of those actions would have occurred before plaintiffs' confinement or prosecution began, so they would fail to meet the first element. In addition, the actions surrounding the warrant and search do not amount to a constitutional violation and, thus, each would fail to provide a basis for malicious prosecution under Tenth Circuit precedent. Becker, 494 F.3d at 919; Taylor, 82 F.3d at 1561.

presented no evidence showing that either Deputy Ruhman or Deputy Forrester caused their continued prosecution, and thus that there was no malicious prosecution by them.[14]

Because plaintiffs have shown constitutional violations as to the search and seizure of their truck and boat only, Sheriff Davis is entitled to summary judgment on plaintiffs' other claims under § 1983.

### B. Alleged Policy or Custom

As to the constitutional violations related to the search and seizure of the truck and boat, the second step in the § 1983 analysis is to determine whether these violations resulted from a policy or custom of the municipality. Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978). Plaintiffs argue that the official action involved in each Fourth Amendment violation was the failure to train Deputy Forrester in the proper execution of a search warrant. Dkt. # 78, at 33-36. The Court will assume, although it is unclear, that this allegation includes the failure to train Deputy Forrester in proper procedures for seizing property. Failure to train can, in "limited circumstances," be considered a municipal policy under Monell, and as such it can serve as the basis for § 1983 liability. City of Canton, Ohio v. Harris, 489 U.S. 378, 387, 388 (1989). Demonstrating a failure to train requires a party to show that the deficiency in training was the cause of the constitutional injury and that the municipality was deliberately indifferent to the need for training. Id. at 388, 391. To prove causation, a plaintiff must show, by "rigorous standards," that the municipality is the "moving force" behind the injury. Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 405 (1997) (quoting Harris, 489 U.S. at 390-91). Deliberate indifference

---

[14]    The Court does not decide whether the prosecutors' decision to wait two months before dismissing the charges was reasonable or would itself constitute malicious prosecution, as that issue is not before the Court.

is present when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." Harris, 489 U.S. at 390. However, "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on [a municipality], for the officer's shortcomings may have resulted from factors other than a faulty training program." Id. at 389.

Even when all inferences are made in their favor, plaintiffs have failed to demonstrate causation for either constitutional violation. To show causation as part of a failure to train theory of liability, plaintiffs must identify a deficiency in the training program that is "closely related to the ultimate injury" and then demonstrate that the deficiency in training caused their injury. See id. at 391. In neither their own motion nor their responses to the defendants' motions do plaintiffs identify a deficiency in Deputy Forrester's training related to unconstitutional seizure. Plaintiffs allege deficiencies in Deputy Forrester's training related to: the production of exculpatory evidence, Dkt. # 78, at 30; the requirements for keeping proper records, particularly inventory and evidence records, id. at 33; the use of drug informants in affidavits for warrants, id.; the need for proper investigation prior to seeking a warrant, id. at 35; the scope of a search under a warrant, id. at 36; and the proper procedure for performing an inventory search of seized vehicles. Id.[15] None of these alleged deficiencies is closely related to the unreasonable seizure of property.

But in addition, plaintiffs make no attempt, beyond a few conclusory statements, to show that any alleged deficiency in training caused either the unconstitutional search or the unconstitutional

---

[15]    Sheriff Davis contends that Deputy Forrester's training, like that of his other deputies, was quite thorough and included training in all of the areas plaintiffs identified. Dkt. # 86, at 27-28.

seizure. See id. at 36 ("Forrester's lack of training regarding the procurement and execution of search warrants resulted in an unlawful search and seizure."). The Supreme Court and the Tenth Circuit require more than a simple statement of fault to prove causation. See Harris, 489 U.S. at 391-92 ("To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident."); Carr v. Castle, 337 F.3d 1221, 1231-32 (10th Cir. 2003) ("All of Carr's other assertions of alleged failure to train or inadequate training flunk the causation requirement, for they uniformly partake of the post hoc, ergo propter hoc fallacy rather than providing any evidence of how the training (or lack thereof) actually resulted in the excessive force."). Therefore, plaintiffs have not met the "rigorous standards" imposed by the Supreme Court on the issue of causation. As a result of the failure to prove causation, plaintiffs cannot show that either constitutional violation was the result of a failure to train Deputy Forrester.

Even if plaintiffs could demonstrate causation, their claim would fail because they are unable to demonstrate deliberate indifference. "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1998). Notice can be established by showing a "pattern of tortious conduct," or a deliberate failure to train the specific skills needed to prevent constitutional violations in recurring situations. Id. at 1307-08. As plaintiffs do not attempt to show a pattern of search and seizure violations by CCSO deputies, the Court assumes that they have intended to prove the latter. In Barney, the Tenth Circuit addressed this

"narrow" method of showing deliberate indifference in reviewing the training of a prison officer. Id. at 1308. The court found that the defendant had completed training in the areas in which he later violated prisoners' constitutional rights and, without some evidence of the adequacy of instruction, the court had "no reason to conclude that Mr. Pulsipher received constitutionally deficient training." Id. Deputy Forrester's training profile shows that he completed a basic training program and field officer training, as well as additional training on the law, serving warrants, and criminal investigation. Dkt. # 86-5, see also Dkt. # 74-3, at 33. Just as in Barney, plaintiffs have not demonstrated that the training Deputy Forrester received was insufficient. They also have made no attempt to show that the CCSO knew that the training was inadequate, and there is no evidence to show that it would be obvious that an officer with Deputy Forrester's training would have insufficient instruction in the relevant areas of the constitution. See Barney, 143 F.3d at 1308 ("Even if the courses concerning gender issues and inmates' rights were less than adequate, we are not persuaded that a plainly obvious consequence of a deficient training program would be the sexual assault of inmates.").

The plaintiffs have failed to prove either that the failure to train was the cause of the constitutional violations or that Sheriff Davis was deliberately indifferent in training Deputy Forrester. Thus, Sheriff Davis's motion for summary judgment should be granted as to plaintiffs' claims of an unconstitutional search and seizure of their truck and boat.

## IV.

In their second amended complaint, plaintiffs allege that the state in which some of their property was returned to them, coupled with the non-return of other items they claim seized, constituted an unconstitutional taking without just compensation under the Fifth and Fourteenth

Amendments. Dkt. # 47, at 34-35. This claim fails as a matter of law, because "there is no Fourteenth Amendment claim where there is an adequate state post-deprivation remedy." Thompson v. City of Shawnee, 464 F. App'x 720, 724 (10th Cir. Feb. 9, 2012) (citing Hudson v. Palmer, 468 U.S. 517, 533 (1984)). As plaintiffs recognize, Oklahoma offers adequate post-deprivation remedies for evidence seized but not returned. E.g., OKLA. STAT. tit. 12, § 1571 (replevin action for property wrongfully detained by another). However, in their motion, plaintiffs refer instead to a claim of taking without just compensation under the Oklahoma Constitution. Dkt. # 78, at 46. While the second amended complaint explicitly refers to the United States Constitution, Dkt. # 47, at 35, it is silent as to the Oklahoma Constitution. "[I]nsertion of new theories of relief into summary judgment briefing is generally prohibited." Doe v. Bd. of Cnty. Comm'rs of Craig Cnty., No. 11–CV–0298–CVE–PJC, 2012 WL 2904518, at *5 (N.D. Okla. July 16, 2012). The Court will not allow plaintiffs to raise this claim for the first time at summary judgment, as to do so would deny defendants the opportunity for discovery and briefing. See Orr v. City of Albuquerque, 417 F.3d 1144, 1153 (10th Cir. 2005); Evans v. McDonald's Corp., 936 F.2d 1087, 1091 (10th Cir. 1991). Accordingly, the Court grants summary motion in favor of both defendants on this claim.

## V.

Plaintiffs' remaining claims arise under state law. Pursuant to 28 U.S.C. § 1367(a), federal courts may exercise supplemental jurisdiction over claims related to the claims over which it has original jurisdiction. A district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3); see Gaston v. Ploeger, 297 F. App'x 738, 746 (10th Cir. 2008) (section 1367(c)(3) expressly permits a district court to decline to exercise supplemental jurisdiction over remaining state law claims after granting

summary judgment in favor of defendant on federal law claims). This Court does not have original jurisdiction over plaintiffs' tort claims, because those claims arise under state law and there is no diversity jurisdiction. The same is true for any claim plaintiffs may bring under the Oklahoma Constitution. The decision to exercise supplemental jurisdiction is discretionary, but courts should consider "the nature and extent of pretrial proceedings, judicial economy, convenience, and [whether] fairness would be served by retaining jurisdiction." Anglemyer v. Hamilton Cnty. Hosp., 58 F.3d 533, 541 (10th Cir. 1995) (quoting Thatcher Enters. v. Cache Cnty. Corp., 902 F.2d 1472, 1478 (10th Cir. 1990)).

The Court finds that the extent of the pretrial proceedings does not outweigh the interests that would be served by having plaintiffs' state law claims tried in a state court. Judicial economy would be served by having the Oklahoma courts resolve issues of Oklahoma law. Further, the Tenth Circuit has "repeatedly recognized that this is the preferred practice." Gaston, 297 F. App'x at 746; see Smith v. City of Enid, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state law claims."); Ball v. Renner, 54 F.3d 664, 669 (10th Cir. 1995) (noting that there are "the best of reasons" for a district court to defer to a state court rather than retaining and disposing of state law claims). The Court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claims.

**IT IS THEREFORE ORDERED** that defendant Board of County Commissioners' motion for summary judgment, Dkt. # 74, is **granted in part** as to plaintiffs' federal claims and **moot in part** as to plaintiffs' state law claims.

**IT IS FURTHER ORDERED** that defendant Sheriff Davis's motion for summary judgment, Dkt. # 76, is **granted in part** as to plaintiffs' federal claims and **moot in part** as to plaintiffs' state law claims.

**IT IS FURTHER ORDERED** that plaintiffs' combined motion for summary judgment, Dkt. # 78, is **denied in part** as to plaintiffs' federal claims and **moot in part** as to plaintiffs' state law claims.

**IT IS FURTHER ORDERED** that plaintiffs' state law claims are dismissed without prejudice. A separate judgment is entered herewith.

**DATED** this 6th day of October, 2014.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE